**HAMPTON et al. v. EWERT et al.** *

Circuit Court of Appeals, Eighth Circuit. September 6, 1927.

No. 7514.

**I. Infants ⬡⟹2—Minority of itself shows incompetency.**

Minority, particularly minority to the extent of tender years, is in itself a recognized badge of incompetency.

**2. Indians ⬡⟹16(3)—Persons securing leases from minor Quapaw Indian allottees must have approval of Secretary of Interior; "age" (Act June 7, 1897, § I [30 Stat. 72]).**

Under Act June 7, 1897, § 1 (30 Stat. 72), relative to leases by Quapaw Indian allottees, persons securing leases from minor allottees had duty of securing approval of Secretary of Interior, in accordance with requirement of such act in case of disability, since, with respect to minors, disability is presumed; "age,"

*Rehearing denied December 15, 1927.

as used in statute, covering young as well as old.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Years of Age.]

3. Indians ⬤⟹16(½)—Rights of lessees dealing with minor Quapaw Indian allottees held not preserved by appointment of guardian and submitting leases to probate court (Act June 7, 1897, § 1 [30 Stat. 72]).

Rights of lessees dealing with minor Quapaw Indian allottees *held* not to have been preserved by appointment of guardian for minors and submission of leases to county probate court for examination and approval, without having secured approval of Secretary of Interior, as required by Act June 7, 1897, § 1 (30 Stat. 72), since, in the absence of congressional action, no such power of probate court can be inferred; Act of May 27, 1908 (35 Stat. 312), concerning exclusively the Five Civilized Tribes, having no application.

4. Statutes ⬤⟹219—Court looks with disfavor on change in construction given statute by executive department, on faith of which parties have contracted.

When executive department charged with the execution of a statute gives a construction to it, and acts on that construction for a series of years, the court looks with disfavor on a change whereby parties who have contracted on faith of the old construction may be injured.

5. Statutes ⬤⟹219—Administrative practice, enlarging scope of unambiguous statute, cannot be given force of law.

An administrative practice, which enlarges the scope of an unambiguous statute, and which is neither uniform, general, nor long continued, cannot be given the force and effect of law.

6. Statutes ⬤⟹219—Wrongful departmental construction of statute must be so adjudged by court.

Where departmental construction of statute is clearly wrong, it is the duty of the court so to adjudge.

7. Indians ⬤⟹15(2), 16(3)—Approval of Secretary of the Interior, necessary to give effect to deed or lease of land, may be retroactive.

When the consent of the Secretary of the Interior is necessary to give effect to a deed or a lease of land, that approval may be retroactive by way of relation as of the date of the deed.

8. Indians ⬤⟹16(3)—Subsequent approval of Indian lease by Secretary of the Interior carries presumption that Indian lessor was not imposed on.

Approval by Secretary of the Interior of lease of Indian lands, although subsequently made, carries with it the presumption that the Indian lessor was in no manner imposed on in conveyance made without original approval.

9. Indians ⬤⟹16(3)—Action of Secretary of the Interior, declaring lease of minor Quapaw Indian allottees void and approving new lease, did not constitute settlement of all rights and liabilities.

Where lease was executed by minor Quapaw Indian allottees without securing approval of the Secretary of the Interior, as required by

Act June 7, 1897, § 1 (30 Stat. 72), subsequent settlement, wherein a new lease was executed with Secretary's approval, after having declared original lease void, *held* not to constitute a final and complete settlement of all rights and liabilities of parties to original lease, as respected right of such minor allottees to recover fair and reasonable return under lease, before such settlement and approval.

10. Indians ⬤⟹16(3)—Secretary of the Interior ordinarily may only approve or disapprove leases by incompetent Quapaw allottees (Act June 7, 1897, § 1 [30 Stat. 72]).

Power of Secretary of the Interior under Act June 7, 1897, § 1 (30 Stat. 72), relative to approval of leases by incompetent Quapaw allottees, ordinarily is one of approval or disapproval.

11. Indians ⬤⟹27(4)—Minor Quapaw allottees held not barred by laches from asserting rights under invalid lease of allotted lands (Act June 7, 1897, § 1 [30 Stat. 72]).

Where lease by minor Quapaw Indian allottee was invalid under Act June 7, 1897, § 1 (30 Stat. 72), because of failure to secure approval of Secretary of the Interior, action by such allottees, after lease had been declared void, to establish their rights therein, will not be barred by laches, since such doctrine has no application because of fact that such lease was void for failure to observe statutory restrictions.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Action by Georgia Valliere Hampton and others against Paul A. Ewert and others; Sidney T. Ewert, as executrix, being substituted for defendant Paul A. Ewert after his death, and L. S. Skelton, one of the defendants, being represented after his death by William B. Hudson, as administrator with the will annexed. From the judgment, plaintiffs appeal. Remanded for further proceedings.

Joseph W. Howell, of Tulsa, Okl., for appellants.

William M. Matthews, of Kansas City, Mo., and Joseph C. Stone, of Muskogee, Okl. (A. E. Spencer, of Joplin, Mo., A. C. Wallace, of Miami, Okl., and George J. Grayston, of Joplin, Mo., on the brief), for appellees.

Before STONE and VAN VALKENBURGH, Circuit Judges, and TRIEBER, District Judge.

VAN VALKENBURGH, Circuit Judge. This action was brought in the District Court for the Eastern District of Oklahoma to recover the value of lead and zinc ore removed from the allotment of one Mary J. Calf, a full-blood Quapaw Indian who died on or

about December 7, 1912. The pleadings are of great length, and the object of the suit is thus well epitomized in the brief of appellants:

"It has for its purpose the cancellation of a certain contract for lead and zinc mining lease on said lands, as well as subsequent contracts in furtherance of the original contract, with the further purpose of having a trust declared in the proceeds of the ore sales resulting from mining operations under the several contracts in question or the recovery of a sum equal to the value thereof, and incidental relief by way of accounting, injunction, and the appointment of a receiver."

The relationship of the parties to the litigation will be hereinafter stated, in so far as may be necessary for an understanding of the issues.

Mary J. Calf, allottee, died about December 7, 1912. She left as her heirs Clarissa (Clara) A. Valliere, now Showalter; John Buffalo; Flora Valliere (Clemons); and the appellants Georgia Valliere (Hampton), James Amos Valliere, and Iva Amelia Valliere. Of the remaining appellants, Ruth Buffalo De Hanas succeeds by inheritance to the one-sixth interest of John Buffalo, deceased, and Lelia Gregory by inheritance to one-half of the estate of Flora Valliere Clemons, deceased. May 5, 1914, a contract was entered into for a lead and zinc mining lease on the allotment of the said Mary J. Calf, in which contract the heirs of Mary J. Calf, by their guardians appointed by the county court of Ottawa county, Oklahoma, were grantors, and one J. S. Mabon was grantee. This contract, while taken in the name of Mabon, was for the joint benefit of himself, the appellee Lenoir C. Church, and Paul A. Ewert, now deceased, who is represented in this appeal by Sidney T. Ewert, executrix under his will. This contract was assigned to appellee Welsh Mining Company, and on October 26, 1915, said mining company obtained a mining lease on said land from the guardians of appellants, appointed as hereinbefore stated. This lease ran for a term ending May 3, 1924, or 10 years, in effect, from the date of the original contract, and reserved a royalty of 5 per cent. to the lessors. On the date this lease was executed, all the heirs of Mary J. Calf, with the exception of Clarissa Showalter, were minors. Flora Valliere Clemons was 15 years of age; appellant James Amos Valliere, 14 years; Georgia Valliere Hampton, 12 years; and Iva Amelia Valliere, 9 years. John Buffalo, now deceased, was then 19 years old, and

Clarissa Showalter had shortly before reached the age of 18 years. In executing the lease aforesaid, one O. K. Knight acted as guardian for Iva Amelia Valliere; one A. S. Thompson, as guardian for John Buffalo; Clarissa Valliere Showalter executed for herself and as guardian for Flora E. Valliere, James A. Valliere, and Georgia Valliere Hampton.

The lease in question purported to be made under authority of the Act of June 7, 1897 (30 Stat. 72), which reads as follows:

"That the allottees of land within the limits of the Quapaw Agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof, for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes. And said allottees and their lessees and tenants shall have the right to employ such assistants, laborers, and help from time to time as they may deem necessary: Provided, that whenever it shall be made to appear to the Secretary of the Interior that, by reason of age or disability, any such allottee cannot improve or manage his allotment properly and with benefit to himself, the same may be leased, in the discretion of the Secretary, upon such terms and conditions as shall be prescribed by him. All acts and parts of acts inconsistent with this are hereby repealed."

The contract for lease was approved and confirmed by the probate court of Ottawa county, Oklahoma, on June 19, 1914, and on October 26, 1915, the same court entered an order approving and confirming the lease of that date. The Welsh Mining Company held this lease and operated the mines on the land covered thereby until October 30, 1917, when it transferred the lease to one L. S. Skelton. To secure the unpaid balance of the consideration for this transfer, it retained a lien on the product of the mines until the balance of the purchase price, to wit, $1,400,000, should be paid. It was provided that Paul A. Ewert should receive 2½ per cent. of the product from this and other leases, to which reference will be made. It was further provided that this provision of the contract should be binding upon the successors of the parties, including their administrators.

Operations were continued under the contract of October 30, 1917, until the spring or summer of 1920. During this period Skelton and his successor, appellee the Skelton Lead & Zinc Company, operated the mines. Of this latter company L. S. Skelton was the sole shareholder, with the exception of 2

shares. The said L. S. Skelton is now deceased, and his estate is represented by appellee William B. Hudson, as administrator with the will annexed. For the purposes of this opinion it is deemed unnecessary to set forth the relationship of appellees other than those hereinabove described.

The record discloses that the said Mabon had also contracted for leases covering the allotments of one Thomas Buffalo and one Buffalo Calf, deceased, Quapaw allottees; that he assigned his interest therein to the said Welsh Mining Company, which company, on August 21, 1917, obtained leases covering said last-named allotments in its own name. By letter of August 17, 1918, to said Welsh Mining Company, by whom said last-named leases were presented for approval, the Commissioner of Indian Affairs called attention to the fact that all of the Indian heirs, except one, which were parties to said leases, had been declared incompetent by the Secretary of the Interior in 1916; that none of the contracts were made pursuant to the regulations of the department, approved April 7, 1917, governing the execution of lead and zinc mining leases on the land of incompetent members of the Quapaw Tribe. He said further:

"Premises considered, I am unwilling to approve these leases, but, in order that you may have full opportunity to be heard, you will be allowed 30 days from the date hereof in which to submit further showing in support of your application. In the event the leases are disapproved, the land will be again offered for leasing upon such terms as may be fair and just to the Indians as well as to all parties concerned. Any person or persons who may be found to have substantial equities will be protected to the extent that equity and justice may demand."

April 7, 1917, the Department of the Interior had promulgated rules and regulations pursuant to an active policy of control over the leasings of the Quapaw lands of minors. Section 4 of those regulations reads as follows:

"Upon the approval of these regulations the superintendent shall secure and forward to the Commissioner of Indian Affairs a correct copy of all lead and zinc mining leases covering restricted lands of incompetent Indians executed prior to the dates when such Indians, respectively, were declared to be incompetent. The superintendent shall also forward with each copy of a lease so executed a full report showing when and where such lease was recorded, the present parties in interest, the status of the property with respect to mining operations thereon, together with any other information that may be necessary to disclose whether action should be taken by the Department of the Interior to protect or safeguard the interests of the lessor. Such leases will be taken up separately in the light of the special conditions relating to each, with a view to bringing the leased lands within the operation of these regulations or the execution of new leases in accordance therewith."

Under the procedure directed by section 4 an investigation was made by the Commissioner of Indian Affairs; this investigation, involving several hearings, covered a period of nearly two years. The leases on the Buffalo Calf and Thomas Buffalo allotments, which had been presented for approval, were primarily involved. The lease on the Mary J. Calf allotment, now before us, was also reviewed; it being felt that:

"A proper appreciation of the equities in this case cannot be had without taking into consideration the fact that the original contracts between Mabon and his associates and these Indian heirs also include a third allotment, which they inherited from Mary J. Calf; said allotment being contiguous to the allotment of Thomas Buffalo."

The finding of the Indian office was announced April 11, 1919.

It having been developed at the foregoing hearings that the rights accruing under the Mary J. Calf lease were predicated upon practically the same facts as in the case of the Thomas Buffalo and Buffalo Calf leases, it was determined by the Commissioner of Indian Affairs that those claiming rights under that lease should be called upon to show cause why the same should not be referred to the courts for cancellation, or be submitted for approval upon such conditions as should be found just and equitable to all concerned. In June, 1920, a hearing was held before Secretary John Barton Payne upon all these leases, including that upon the Mary J. Calf allotment. At all these hearings all the parties appeared in person or by attorney. At the hearing before the Secretary no new testimony was taken, but the facts elicited in the previous hearings and the conclusions reached were before him. He held these leases to be invalid. This decision was rendered June 11, 1920. The Secretary instructed that a conference be held for the purpose of formulating plans and making arrangements which would protect the rights of the Indians, deal justly with all parties concerned, and prevent

litigation between the Skelton Lead & Zinc Company and the Welsh Mining Company concerning the lease rights involving the Mary J. Calf allotment. The plan evolved, which received the approval of the Secretary, is thus stated in a letter of June 14, 1920, by Assistant Commissioner Merritt:

"The following plan to carry out your instructions in the matter has been prepared by me and agreed to by the parties present at the conference. Said plan provides that a lease in favor of the *Skelton* Lead & Zinc *Mining* Company shall be executed for a term of 10 years in conformity with the provisions of the regulations approved April 7, 1917, so far as applicable, which lease shall provide for royalty to the owners of the land of 10 per cent. of the gross production of all zinc and lead ore extracted from said land, except that for all ore sold for $50 or more a ton, on which a royalty of 12½ per cent. shall be paid by lessee. The Skelton Lead & Zinc Mining Company is to make such arrangements, if possible, with the Welsh Mining Company, as will prevent litigation concerning the lease rights over the above-mentioned Mary J. Calf allotment."

July 9, 1920, a new lease was executed to the Skelton Lead & Zinc Company, appellee herein, by all the heirs of Mary J. Calf, allottee, in substantial conformity with the plan submitted. This lease was submitted for approval of the Secretary in a letter of the Indian Office of September 1, 1920, which contains the following language descriptive of the settlement and adjustment made in connection with the giving of this new lease:

"Following your decision of June 11, 1920, that the lease of the Welsh Mining Company covering the Mary J. Calf allotment was void, arrangement was made in accordance with the provision in Indian Office letter of June 15, 1920, approved by you on the same date, for a lease of the Mary J. Calf allotment, to be made to the Skelton Lead & Zinc Company for lead and zinc mining purposes. It was provided that the lease with the Skelton Lead & Zinc Company should be for a term of 10 years and in conformity with the provisions of the regulations approved April 7, 1919, so far as applicable, and that a certain royalty should be required. It was also provided that the Skelton Lead & Zinc Company was to make such arrangement, if possible, with the Welsh Mining Company as would prevent litigation concerning the lease rights on the above-mentioned Mary J. Calf allotment. It was the understanding of this office that, when the

lease on the Mary J. Calf allotment was awarded the Skelton Lead & Zinc Company, if possible, an adjustment as to the equities between the Skelton Lead & Zinc Company and the Welsh Mining Company and its assignees should be made. It appears, however, from the papers transmitted herewith, that the matters in controversy between said companies have not yet been adjusted. Inasmuch as they have been unable to reach an agreement in said matters, it is recommended that the above-mentioned lease of Iva Amelia Valliere et al. to the Skelton Lead & Zinc Company, covering the Mary J. Calf allotment, be approved, with the understanding that, in the approval of said lease, the Secretary of the Interior does not either find or settle or adjudicate any differences existing between the Welsh Mining Company or its assignees and the Skelton Lead & Zinc Company, growing out of their previous relationship, interests, or dealing concerning the mining leasehold rights on the above-mentioned Mary J. Calf allotment."

The Secretary approved the new lease in the following language:

"The petition of Mr. Paul A. Ewert, mentioned above, is hereby denied. The lease of July 9, 1920, of the allotment of Mary J. Calf, deceased, to the Skelton Lead & Zinc Mining Company, for lead and zinc mining purposes, has this day been approved in accordance with the recommendation of the Assistant Commissioner of Indian Affairs above set forth. Payne, Secretary."

The petition of Paul A. Ewert mentioned was for rehearing in the matter of the mining leases on the Mary J. Calf allotment, etc., upon which the ruling of the Secretary was made. Briefly stated, the position of appellants is:

(1) That the original contract and lease were void, because the minor heirs conveyed through guardian, without approval of the Secretary of the Interior.

(2) That all who profited, directly or indirectly, thereunder should be held to respond in damages as trespassers and trustees ex maleficio.

(3) That the original contract became forfeit for nonperformance on the part of Mabon, and in any event, that the succeeding lease was void, under the authority of United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844.

Appellees contend:

(1) That the lease was valid because the Act of June 7, 1897, presumptively removed all restrictions upon leasing, and that the

approval of the Secretary was not required, unless it was first made to appear that by reason of age or disability the allottee could not improve or manage his allotment properly and with benefit to himself.

(2) That this was the construction placed upon the act by the department, on the faith of which the lessees and their assigns were led to make a large investment in the way of development and improvements upon the leased premises.

(3) And, finally, that the entire matter was adjusted by the Secretary of the Interior, whereby a new lease was made. That the secretary's action operated as an approval of the old lease as to all operations prior to the approval of the new lease, and as a complete and final settlement of all rights and liabilities of the parties thereto and those claiming under them.

(4) That appellants were guilty of laches in bringing this action.

The case turns largely upon the construction of the Act of June 7, 1897, and upon the authority of the Secretary of the Interior in the proceeding thereafter instituted before him, as a result of which the new lease was made and approved. The act of 1897 followed upon prior provisions with respect to the leasing of Quapaw lands. The contention of the government is that under the act the lands of all Quapaws under disability of any nature, including that of age, by reason of which such allottee is incapable of improving or managing his allotment properly, or with benefit to himself, may be leased only in the discretion of the Secretary, and upon such terms and conditions as shall be by him prescribed. The contention of the appellees, on the other hand, is that all allottees in the Quapaw Agency are by the act empowered to make such leases, unless it is made to appear to the Secretary that they are disqualified for the reasons stated in the act. In other words, one side claims that any lease made is void, in the absence of approval by the Secretary in case of incompetency; the other, that such a lease is valid, unless in advance thereof the matter has been called to the attention of the Secretary, and his disapproval has followed.

As above stated, the act of 1897 was preceded by a number of other acts with respect to the leasing of Quapaw lands; among these is that of February 28, 1891 (26 Stat. 794) which provided that no Quapaw Indian, if able to occupy and improve his allotment, should be permitted to lease the same; the purpose being to require these Indians to live upon and cultivate their lands, and thus

fit themselves for the responsibilities of independent citizenship. This act, however, contained a proviso substantially in the same language as that contained in the act of 1897, just quoted, with respect to those laboring under disability. The act of August 15, 1894 (28 Stat. 286, 305), carried forward the same provision without material change. The difference between the act of 1897 and these prior acts is that in the earlier acts all Quapaws were forbidden to lease except in case of disability. In the act of 1897 all are permitted to lease without governmental supervision except in case of disability. The restrictive provision is the same in both cases. It is evident that by this legislation Congress created two classes of Indians—those with freedom to lease and those with a restricted or limited power to lease. The material question upon this phase of the controversy is when and how the mattter of disability is to be determined—whether, before leasing, it was the duty of those desiring to enter into such contract relations with the Quapaws to apply to the department for a determination of the status of the Indian and his right to enter into lease, with or without express departmental approval, or whether all Quapaw Indians were presumed to be capable of contracting, unless the department should have the point raised and it should be made to appear to the Secretary that the disability existed. The case at bar, therefore, in this respect turns upon the question of whether minority is such an automatic and presumptive disqualification that it was necessary to seek the approval of the department before a valid contract of lease could be made.

[1, 2] It is readily perceived that the construction for which appellees contend would open the door to wholesale overreaching, and to fraud upon the spirit of the law as applied to the relationship existing between the government and its Indian wards. Minority, and particularly minority to the extent of tender years, is in itself a recognized badge of incompetency. The word "age," as employed in the act, by definition covers equally the young as well as those of advanced years. In the case of the latter, however, the same presumption does not obtain, and inquiry would be necessary to determine whether such individuals have reached the point of disability. With respect to minors such disability is presumed. If, therefore, third parties are permitted at will to contract with such, with no duty to apply to the Secretary for approval, it is obvious that the protection contemplated by the law, and by

the general attitude of the government towards its Indian wards, could be nullified, and irreparable damage could be done with no subsequent power of intervention. It is our judgment, therefore, that in the case of minors the law imposed upon those dealing with them the duty to secure approval by the Secretary.

[3] It is urged, however, that the law was satisfied, and that the rights of the lessors were preserved, by the appointment of guardians and by the submission to the county or probate court of Ottawa county for examination and approval. This could be so only if Congress had seen fit to make those courts quasi governmental agencies. This Congress has not done, and in the absence of Congressional action no such power can be inferred. The act of 1908 (35 Stat. 312), which concerns exclusively the Five Civilized Tribes, has no application. It is true that, under that act, to county courts has been delegated power to appoint guardians and to approve the alienation of restricted land; but, in the absence of such express delegation by Congress, the right of supervision by the county court cannot be conferred. The Secretary of the Interior cannot delegate it. It is true that, if we indulge the premise that the minors had unrestricted power to lease, then, under the general law, no doubt the county courts would have authority to approve the acts of guardians; but this would be true only where the Indian ward is emancipated from governmental supervision.

The term "age," as used in the Act of February 28, 1891, in the rules and regulations to be observed in the execution of leases of Indian allotments, was defined to apply to all minors under 18 and all other persons disabled by reason of old age. In a letter from the Acting Commissioner of Indian Affairs to the Indian agent of the Quapaw Agency, of date July 26, 1897, this definition in substance was restated, and it was directed that the lands of such allottees could only be leased in the discretion of the Secretary. It was pointed out that this could be done, as theretofore, under the Act of February 28, 1891. In a letter from the Indian Office to the Secretary of the Interior, of date November 23, 1901, this language appears:

"As stated in office letter of the 29th ultimo, the office held that the proviso in the Act of June 7, 1897 (30 Stat. 72), related to minors, idiots, insane persons, and others who by reason of 'age or disability' could not enter into a legal contract—that is, that these classes of persons could not lease their lands

except in the discretion of the Secretary of the Interior. It therefore appears that any contract touching the allotments of these minor Quapaw Indians must be approved by the Secretary before it becomes of legal effect."

By letter of January 21, 1902, from the Secretary of the Interior to the Commissioner of Indian Affairs, this construction was expressly approved.

January 24, 1907, regulations, promulgated under the Act of June 7, 1897, provided that any mineral lease theretofore made by or on behalf of any allottee whose name is included in section 11 of such regulations, which, by its terms, was still in force, was declared to be subject to examination, modification, revision and approval by the Secretary of the Interior, and must be transmitted by the lessee or party in interest for such purpose. A failure by any such lessee to meet this requirement after notice would be deemed to constitute justification for the Secretary to declare a lease so withheld to be null and void. It was further provided:

"If any allottee named in section 11 of these regulations dies and leaves one or more minor heirs a lease of his allotment may be made by the guardian, but it must be accompanied by evidence of approval of the court having jurisdiction to appoint a guardian."

In section 11 referred to appears the name of Mary J. Calf.

As early as in 1902 it was brought to the attention of the department that leases of allotments of Quapaw incompetents were being made without the approval of the department. November 21, 1902, the Commissioner of Indian Affairs wrote to the superintendent of the Quapaw Agency, in response to a request for instructions as to what action, if any, should be taken respecting such leases. The Commissioner said:

"You state that since the passage of the Act of June 7, 1897, * * * it has been customary for them to lease, not only their own lands, but those of their minor children, * * * and such leases are made without consultation in your office and without submitting them to this office for approval.

"You therefore request instructions as to what action, if any, shall be taken by your office toward requiring contracts of lease for the lands of minor allottees of the Quapaw Agency to be submitted to this office and the Secretary of the Interior for approval.

"This office cannot give its consent for these lands to be leased contrary to law, but, if the parents or guardians of such minors

persist in making leases on their allotments, it is not thought advisable that you should be charged with the responsibility of hunting up such cases and taking legal action against the lessees."

The regulations of January 24, 1907, followed in due course. The Indians, inspired, as appears from the record, by certain white men, some of whom were adopted members of the tribe, protested against this action of the Secretary. In an effort to secure information and arrive at some practical solution of the difficulty, Robert G. Valentine, secretary to the Commissioner of Indian Affairs of the Quapaw Agency, was sent to make an investigation. He made his report to the Commissioner on May 16, 1907. In this report he recommended a modification of these regulations, and submitted a list of those who, in his opinion, should be kept subject to departmental supervision. This specific list contained 25 names, among which was that of Mary J. Calf. July 30, 1907, the Indian Office recommended that the regulations accordingly be rescinded, and that it be authorized to make requests of the local courts for the appointment of guardians for the management of the estates of those included in this list.

On November 15, 1907, the Department of the Interior, through its Acting Secretary, by letter concurred in the main with these recommendations, and undertook to amend section 11 of the regulations approved January 24, 1907, by striking therefrom the names of all allottees except those included in the list above mentioned. It was directed that: "Those included in that list will be released from said regulations when and as legal guardians may be appointed for them, or when hereafter it is determined, upon further investigation, that they are competent to take charge of the matter of leasing their lands." This direction of the department was promulgated by letter of the Acting Commissioner of Indian Affairs of date November 21, 1907.

By letter of January 30, 1909, from the Assistant Secretary of the Interior to the Attorney General, the act of June, 1897, together with the intervening action of the department thereunder, as hereinabove set forth, was reviewed. It was further recited that under the instructions of the department the superintendent of the Quapaw Agency, on April 12, 1908, reported that he had endeavored to have guardians appointed; that the appointment of guardians was strongly opposed by the Indians, upon the ground that they were competent to attend to their own business affairs. Accordingly, on May 19, 1908, the department authorized the Indian Office to instruct the superintendent to take no further action in that regard. It is upon this letter that appellees mainly rely as a departmental departure from the regulations of January 24, 1907, and a recognition of the right of minors and other incompetents to lease through guardians, without the approval of the Secretary.

It is conceded in the briefs that the regulations aforesaid recognized the necessity of such departmental supervision. It is obvious, upon the record, that those regulations were never formally rescinded, and that the letters indicating such a purpose were written merely in an effort to adjust irregularities that had crept in, as reported by the Quapaw Agency, if possible, without resort to drastic remedies, and without running counter to the wishes of the Indians, if that could be avoided. Upon ascertaining that the suggestions of the department in this regard met with strong disfavor and opposition, the Indian agents were instructed to proceed no further in that regard, and therefore, in our judgment, the regulations of January 24, 1907, remained in full force and effect.

Pursuant to the policy of the department to deal in the most practical and satisfactory manner with the condition which confronted it, in August, 1910, a commission was appointed to investigate the condition, qualifications, and competency of all Indian allottees; that commission reported on November 12, 1910; thereto was appended a list of Indians not qualified to have the restrictions unconditionally removed from their allotments, but capable of conducting ordinary business transactions, such as leasing their lands. In this list appears the name of Mary J. Calf. It appears, however, that none of the parties to this litigation were named under this classification. This was necessarily so, because the report was filed in 1910, and Mary J. Calf lived until 1912. Her minor heirs were, therefore, not covered by this report. It may be added, also, that in the various investigations and reports made the competency or incompetency of adult Quapaws was uppermost in mind. Throughout the record minors are recognized as incompetents by reason of their minority within the language of the Act of June 7, 1897. This report of the Commissioner was approved by the department.

About this time, to wit, September 19, 1910, the Circuit Court for the Eastern District of Oklahoma in United States v.

Abrams, 181 F. 847, decided, in effect, that under the Act of June 7, 1897, Congress intended to place the Indian upon his own responsibility, and that he should take his place as a citizen of the United States and of the state, together with all other citizens, of whatever race or color. The decree in that case was affirmed by this court May 23, 1912; one judge dissenting. 197 F.'292. Upon appeal to the Supreme Court that decree was reversed, with the holding that the Quapaw Indians were still under national tutelage, and the guardianship of the United States continued, notwithstanding the citizenship conferred upon allottees. 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844. This decision was rendered April 5, 1915.

The mental attitude of the Indian Office and the county court of Ottawa county respecting leases under the Act of June 7, 1897, is disclosed by the correspondence between the county judge of Ottawa county and the Commissioner of Indian Affairs. The former in his letter of June 23, 1915, says:

"Recently there has been a question in the minds of several of the attorneys in the Quapaw Agency relative to the authority of the county court to execute such contracts. And there is in my own opinion a serious doubt as to that authority. I have been unable to find any express act of Congress conferring jurisdiction upon the county court over the estates of Indian minors in the Quapaw Agency. * * * It will be noted that this express authority was given in the act of 1908 relative to the Five Civilized Tribes."

He then quotes section 4 of the Act of Congress approved June 25, 1910 (36 Stat. 856 [25 USCA § 403; Comp. St. § 4221]), and the proviso in the Act of June 7, 1897, here under discussion, and says:

"It strikes me that, by construing these two sections together, there may be some merit in the theory that the allotments of these Indian minors could not be leased, except according to such rules and regulations as the Secretary of the Interior might prescribe."

He calls attention to the fact that Ottawa county is divided into two parts; one being a part of the Cherokee Nation, and the other being the Quapaw Agency; that the county court already had authority over Cherokee minors by virtue of an express act of Congress; and suggests the desirability of a like jurisdiction being conferred upon the county court over Quapaw minors. In his reply, dated December 2, 1915, the Commissioner of Indian Affairs confirms these views and points out:

"That the lands were allotted pursuant to the laws of the United States; that they are under supervision of the federal government; and that the law of the United States contemplates regulations, or the equivalent of regulations, governing leasing of minors and other incompetents. Hence it would seem that authority conferred by you upon the guardian to lease a given allotment for the benefit of his ward should, in order to preserve the federal principle, be made subject to approval by some representative of the federal government as contemplated by the act. * * * We must also bear in mind that there is a federal question involved, because of the legal status of the land and the necessity under the law, by supervision of the United States government of the leasing thereof."

The efforts of the department to bring about a satisfactory solution of the conditions found to exist since the passage of the Act of June 7, 1897, found expression in the regulations of April 7, 1917, hereinabove quoted, under which the lease in question·was brought before the Secretary of the Interior to determine whether action should be taken by the department to protect or safeguard the interests of the minor lessors.

It will be noted that the lease of October 26, 1915, was executed, without approval of the Secretary of the Interior, more than six months after the decision of the Supreme Court in United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844, was announced. In the District Court, and in this court, the government had been represented by Paul A. Ewert, then in government employ. He resigned his position in 1912. He procured the contract with Mabon, which ripened into the lease of October 26, 1915, while these cases were before the Supreme Court on appeal. He, therefore, had personal knowledge of the question involved. With respect to his interest in the lease on this allotment, he says in a letter of January 14, 1919, to the Commissioner of Indian Affairs:

"I was to be the owner of those leases, and in truth and in fact the owner of the leases. I was the 'captain of industry.' I was acquiring the leases. I was letting Church and Mabon in, if they would agree to do the drilling that the probate court might require to be done. I was giving them one-half of this 5 per cent. lease."

Upon this statement, and upon the record generally, the status of the Ewert interest must be fixed as that of a joint lessee, unaltered in substance by the subsequent con-

tracts between Ewert and appellees Church and Mabon.

[4–6] The foregoing recitals, tedious in extent, but essential to a fuller understanding of the issues framed, fairly present those features of the evidence from which the application of the act of June, 1897, to the present controversy may be deduced. We conclude that, under the spirit as well as the letter of that act, the allotments of Quapaw minors could not be leased, except in the discretion of the Secretary of the Interior, with his approval, and upon such terms and conditions as should be prescribed by him; that the regulations promulgated, and the record as a whole, reveal conclusively that this was the interpretation which the department placed upon the act; that any seeming departure from this construction was suggestive merely, was never established as the administrative policy of the department, and, meeting with strong opposition, was abandoned long prior to the contract and lease in suit. We have not lost sight of the rule that, when the executive department charged with the execution of a statute gives a construction to it and acts upon that construction for a series of years, the court looks with disfavor upon a change whereby parties who had contracted upon the faith of the old construction may be injured. United States v. Alabama Great Southern R. R. Co., 142 U. S. 615, 12 S. Ct. 306, 35 L. Ed. 1134. But it is equally true that an administrative practice which enlarges the scope of an unambiguous statute, and which is neither uniform, general, nor long continued, cannot be given the force and effect of law. Iselin v. United States, 270 U. S. 245, 46 S. Ct. 248, 70 L. Ed. 566. And if a departmental construction of a statute is clearly wrong, it is the duty of the court so to adjudge. United States v. Finnell, 185 U. S. 236, 22 S. Ct. 633, 46 L. Ed. 890.

The construction of the department under this and prior acts was consistently to the effect that the term "age," used in these acts, embraced minors under the age of 18 years; that the approval of the department was essential to the valid leasing of the allotments of such minors. The administrative practice invoked by appellees, which sought to enlarge the scope of the statute by delegating to the county court the duty of supervision which had been lodged in the Secretary of the Interior, was, as has been said, suggestive merely, was soon abandoned, and can furnish no support to this contention of appellees. Furthermore, the statute in itself is unambiguous in terms. In such case the purpose of Congress cannot be changed by departmental construction. By express enactment Congress had conferred upon county courts the power to approve leases by Indians of the Five Civilized Tribes (Act of May 27, 1908, 35 Stat. 312), and upon this Ottawa county court the same power with respect to Cherokee minors. The absence of such delegation of authority in the case of the Quapaws is conclusively significant.

To the contention that appellees have made large investments in good faith and in reliance upon their right to lease through guardians with approval of the county court, and without approval by the Secretary, it is sufficient to point out that, desiring to do equity in all things, although standing upon and asserting all legal rights due them, appellants are willing and offer to accord said appellees, or any of them, all just and equitable amounts by way of expenditure which in good conscience they are entitled to receive in reduction of the claims asserted by appellants.

[7, 8] It is next urged by appellee that, even though the Welsh Lead & Zinc Company lease be held to require the approval of the Secretary of the Interior, "there was a final and complete settlement, all parties in interest consenting thereto, with the approval of the Secretary of the Interior, of all the rights and liabilities of all parties to the Welsh lease and those claiming under them." It must be conceded that, when the consent of the Secretary of the Interior is necessary to give effect to a deed or lease of public land, that approval may be retroactive by way of relation as of the date of the deed, Lykins v. McGrath, 184 U. S. 169–171, 22 S. Ct. 450, 46 L. Ed. 485; Pickering v. Lomax, 145 U. S. 310, 12 S. Ct. 860, 36 L. Ed. 716; Lomax v. Pickering, 173 U. S. 26, 27, 19 S. Ct. 416, 43 L. Ed. 601; this, upon the theory that the restriction is placed upon alienation in order that the Indian may not be wronged in any disposition of his property he may desire to make. The approval by the Secretary, although subsequently made, carries with it the presumption that the Indian grantor was in no manner imposed upon in the conveyance made without original approval.

In Anchor Oil Co. v. Gray, 257 F. 277, this court has held that a lease of his lands by an allottee of the Five Indian Tribes, when approved after his death by the Secretary of the Interior, relates back to and takes effect as of the date of its execution. It was further held that the Secretary of the Inte-

rior had plenary authority to approve and validate the lease of an allottee after his death, notwithstanding the provision of section 9 of the act of May 27, 1908. And again, in United States v. Dunn, 288 F. 158, we held that: "A compromise and settlement, made by the United States, through which it received moneys for a minor Indian, had the effect of confirming an oil lease of the Indian's land, and rendered the lease valid, though guardian of minor Indian was guilty of fraud in retaining secret interest in the lease."

Judge Lewis in his opinion said: "The compromise and settlement made by the plaintiff through which it received $45,000 for the minor had the effect of confirming the lease. * * * There is no testimony in the record which supports a conclusion that the Thomas lease was made for an inadequate consideration, and that it did not provide fair and reasonable returns to the ward."

If we were to concede to appellees full force to the principle urged, to wit, that the Secretary of the Interior may by subsequent approval validate a lease theretofore executed without his approval, and may, in certain cases, adjust and settle the rights and liabilities of the parties thereto, still we think in the case before us the facts do not justify the application of that rule. As stated in the cases cited from the Supreme Court, and from this court, the approval must ultimately be made in order to validate what has gone before. It must further appear that the Indian grantor was in no manner imposed upon in the conveyance; that the lease made was for an adequate consideration and provided fair and reasonable returns to the ward; and that, if this be not true, at least some return must be exacted from the lessee in the compromise and settlement made to compensate the ward for the inadequacy of such returns.

[9, 10] In the first place, the Secretary of the Interior did not approve the old lease. He declared it void. So one of the first elements of subsequent validation is lacking. In the next place, it appears quite clearly from the record that the regular, customary, and adequate return upon such leases was a sum of money equal to 10 per centum of the market value of the products mined. This lease reserved a royalty of but 5 per cent. It is evident that the Secretary of the Interior did not consider this a fair return, and we concur in that view. The minor Indians were, in our judgment, overreached and imposed upon in the lease conveyance made.

The appellants, children and heirs of Mary J. Calf, were all of tender years. Furthermore the power of the Secretary ordinarily is one of approval or disapproval. He cannot initiate or make a lease. Midland Oil Co. et al. v. Turner (C. C. A. 8) 179 F. 74; Scep et al. v. Spade (C. C. A. 8) 179 F. 77; Jennings v. Wood et al. (C. C. A. 8) 192 F. 507.

In United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844, the practice of making overlapping leases was expressly disapproved, as violative of the letter and spirit of the act. It was pointed out, however, that an agreement for a new lease, at a fair rental, made shortly before the expiration of an existing lease, would probably be sustained. This presupposes the existence of a valid existing lease. In our judgment, the making of a 10-year lease, with 4 years of a prior invalid lease yet to run, the lessees being permitted to retain the fruits of 6 years' enjoyment of that invalid lease, would run counter to the provisions of the act of 1897 and to the construction placed upon it by the Supreme Court, and we doubt the power of the Secretary of the Interior, by compromise or settlement, to bring about such an anomalous result.

Finally, we do not think the Secretary, by his action in declaring the old lease void and approving the new lease to the Skelton Lead & Zinc Company, undertook to foreclose appellants from asserting any rights they may have against appellees, or any of them, arising out of operations under the lease which he declared void. It is true that he expressed the desire that the Skelton Lead & Zinc Company was to make such arrangement, if possible, with the Welsh Mining Company, as would prevent litigation concerning the lease rights on the Mary J. Calf allotment, and subsequently approved the lease with the understanding that thereby he did not either find or settle or adjudicate any differences existing between the Welsh Mining Company or its assignees and the Skelton Lead & Zinc Company, growing out of their previous relationship or dealing concerning the mining leasehold rights on said allotment. It is evident that the Secretary had in mind disputes existing between these two companies, because of the fact that the Skelton Lead & Zinc Company had agreed to pay large sums to the Welsh Mining Company under a lease calling for a royalty of but 5 per cent. The old lease, with 4 years yet to run, had been declared void, and the new lease carried a royalty of 10 per cent. Naturally the payments to the Welsh Com-

pany under the latter instrument would involve a much greater burden to the Skelton Company. We do not think any further finding, settlement or adjudication involving the rights of other parties to the controversy was contemplated by the Secretary as matter of law. In his testimony he does say:

"It was my purpose to settle the entire controversy, and to make an end of all litigation and controversy, except as to the matter involved between the Welsh Mining Company and the Skelton Lead & Zinc Company, which was expressly excepted from the decision."

No doubt this was his purpose. His conscious lack of authority is disclosed by his later testimony on cross-examination:

"Q. In your approval of this lease, or in any letter or decision, do you recall passing upon the rights of Paul Ewert, or finding any equities in his favor? A. I recollect Paul A. Ewert very well indeed. He afforded me the amusing feature of the hearing. My sense of humor has always been highly developed, and he contributed materially. My decision, as well as my personal feeling, was that he had been very handsomely treated, and was not entitled to any further consideration.

"Q. In so stating, is it your intention to say that he was entitled to be paid as he was up to that time for what he had done? A. My recollection was that I had no jurisdiction to make him refund anything, and that my decisions could only leave him as he was."

In view of the disclosures of the record, that the old lease was without adequate consideration, and that in the new lease the Secretary procured from the lessee only the regular and customary royalty for leases of this nature, with no compensation for past trespasses, by way of compromise or otherwise, it is difficult to perceive how this action of the Commissioner, under the law as stated, can be accepted as a release of all claims under the prior invalid lease.

[11] It is next urged that appellants are guilty of laches in bringing this action. In Ewert v. Bluejacket, 259. U. S. 129–138, 42 S. Ct. 442, 444 (66 L. Ed. 858), a case in which the deceased Paul A. Ewert was a party, the Supreme Court said:

"The purchase by Ewert, being prohibited by the statute, was void. Waskey v. Hammer [223 U. S. 85, 32 S. Ct. 187, 56 L. Ed. 359] supra. He still holds the legal title to the land, and the equitable doctrine of laches, developed and designed to protect good-faith transactions against those who have slept upon their rights, with knowledge and ample opportunity to assert them, cannot properly have application to give vitality to a void deed, and to bar the rights of Indian wards in lands subject to statutory restrictions."

Appellees seek to distinguish this case, because there Ewert, as an attorney in the employ of the United States, had a forbidden personal interest and concern in that dealing with the Indians. The deed was void on that account, but the language of the decision, as well as the principle involved, applies equally to all transactions which are void because of failure to observe statutory restrictions of this nature.

Appellants seek, also, to set aside the new lease because of alleged corruption between the lessee and Clara Showalter, guardian of the infant heirs. In our judgment, however, this lease appears to be fair on its face, was within the power of the Secretary to approve, was executed by all the parties in interest, who were represented in person or by attorney, and the charge of corruption and fraud was not established by any competent evidence offered or admitted.

Appellees also claim that, as to the Skelton estate, appellants are barred because of failure to file their claims with the administrator within the time required by state law. The Supreme Court of Oklahoma seems to confine this rule to claims arising on contract. American Trust Co. et al. v. Chitty et al., 36 Okl. 479, 129 P. 51; Donnell v. Dansby, 58 Okl. 165, 159 P. 317; Asher v. Stull, 61 Okl. 320, 161 P. 808. However, it is not intended hereby to deal specifically with the matter of recovery or nonrecovery against the various appellees.

As to the recovery to which appellants may be entitled, the principle by analogy is thus well stated by Judge Sanborn in United States v. Debell et al. (C. C. A. 8) 227 F. 760, 761:

"One who, with knowledge of the incompetency of an Indian for whom the United States holds his land in trust, without the power in him to alienate it, induces him to sell the land to himself and apply for and obtain a patent in fee simple for it, and then to convey it to him, wrongfully appropriates the land to himself, becomes a trustee de son tort thereof and of its proceeds for the benefit of the Indian, and the United States may maintain a suit in equity to set aside, as against him, the patent and the deed, and, in case the title has passed to an innocent subsequent purchaser, to recover of the appropriator the amount he realized from the land above the amount he paid for it to the Indian."

The rights and liabilities of the individual appellees were not passed upon by the court below, which ruled against appellants generally without assignment, by opinion, of the grounds for its decision. The evidence adduced is insufficient to enable this court satisfactorily to pass upon this phase of the controversy. It is deemed best, therefore, to remand the case to the District Court for further proceedings in accordance with the views herein expressed, and for such incidental orders as may be necessary to protect the rights and interests of all parties, and as justice and good conscience may require.

It is so ordered.