## WHITEBIRD et al. v. EAGLE–PICHER LEAD CO. et al.

District Court, N. D. Oklahoma. September 10, 1928.

No. 178.

Ames, Lowe & Cochran, of Oklahoma City, Okl., and Whipple & Rosenbloom, of Okmulgee, Okl., for plaintiffs.

Squire, Sanders & Dempsey and Atlee Pomerene, all of Cleveland, Ohio, A. E. Spencer, of Joplin, Mo., and A. C. Wallace, Vern E. Thompson, and Ray McNaughton, all of Miami, Okl., for defendants.

KENNAMER, District Judge. This is an action to cancel mining leases covering the allotments of Eudora Whitebird, Mary Whitebird, and Joseph Whitebird, deceased Quapaw allottees, and for an accounting as to the ores taken from the allotments of lands by the defendants, operating mines upon the lands under the leases sought to be canceled, and for judgment for the value of the ores so taken, alleged to aggregate millions of dollars.

It was established that pursuant to the Act of Congress approved June 7, 1897 (30 Stat. 62), on the 30th day of July, 1912, Mary Whitebird and the heirs of Eudora Whitebird and Joseph Whitebird, executed mining leases to one George W. Beck, Jr., covering the three allotments of Quapaw Indian lands. The leases were for a term of 10 years, and were executed for the purpose of affording the lessee the privilege of prospecting and mining for lead, zinc, and other minerals, providing for the payment of a royalty of 5 per cent. of the market value of the ore to be paid to the lessors. It was further developed that Beck subleased the Eudora Whitebird and Joseph Whitebird allotments to S. C. Fullerton, at a royalty of 10 per cent.; that Fullerton subleased to the Eagle-Picher Lead Company at a royalty of 12½ per cent.; that thereafter the Eagle-Picher Company subleased portions and parcels of the lands to various sublessees at royalties of 17½ per cent.; that Beck subleased the Mary Whitebird allotment to Ful-

lerton for a royalty of 10 per cent., who in turn subleased it to the Eagle-Picher Company at a royalty of 12½ per cent., and that the Eagle-Picher Company subleased portions thereof to various sublessees at royalties of 17½ per cent.

The evidence discloses that the lands were mined by the Eagle-Picher Lead Company and its sublessees, together with other lands in the vicinity, until the year 1920, about two years prior to the expiration of the terms of the original leases, when the Eagle-Picher Company and 22 of its sublessees entered into an agreement respecting their activities and conduct for the procuring of new leases from the Indian owners of the lands. It is alleged in the bill of complaint that the purpose of the agreement was to render possible the obtaining of the leases from the Indian land owners without competitive bidding. However the evidence adduced on the trial of the case discloses that in January, 1921, the Eagle-Picher Lead Company, S. C. Fullerton, George W. Beck, Jr., and W. W. Dodson obtained new leases from the Indian owners on the three allotments involved in the action, providing for a royalty of 7½ per cent., which leases were submitted to the Secretary of the Interior for approval; that briefs were presented to the Secretary supporting arguments in favor of approval of the leases, but that the Secretary of the Interior refused to approve them because of the want of adequate and reasonable royalty. It was further developed that after such negotiations, and after bids had been submitted by various persons for leases upon the lands involved herein, Fullerton and Beck became competitive bidders for the leases to the Eagle-Picher Company, and thereafter the Secretary of the Interior referred the matter of ascertaining the situation with reference to the making of leases upon the lands to a commission and assigned to the commission to aid them an engineer from the Bureau of Mines.

A report was submitted by the engineer and the commission. The report of the engineer contains a lengthy detailed statement of the conditions in the Quapaw mining district—a review of the different methods of mining, so as to conserve the mines, the necessity for proper drainage, marketing of the ore, adequate mining machinery, and many other items necessary to a profitable operation of the mines to the lessors and lessees. This report included a consideration of the various bids, and in pursuance of the recommendations contained therein the leases were awarded to the Eagle-Picher Lead

Company at a royalty of 10 per cent. The report in full may be found in the office of the clerk of this court.

On July 27, 1922, the Secretary of the Interior approved the form of lease to be executed pursuant to the award made to the Eagle-Picher Company, and transmitted it to the Superintendent of the Quapaw Indian Agency at Miami, Oklahoma, with instructions to have the same executed by the Indian owners, the complainants in this action. The Indian owners appeared before the Superintendent at Miami, and refused to execute the leases awarded and approved by the Secretary of the Interior, and filed a written protest against the execution of the leases. The written protest was predicated upon the ground that a royalty of 10 per cent. was insufficient, and that a higher royalty could be obtained from other bidders. Under orders of the Secretary of the Interior the leases awarded to the Eagle-Picher Lead Company were executed by O. K. Chandler, Superintendent of the Quapaw Agency, on behalf of the Indian owners.

The pleadings and the evidence introduced present two questions for determination. They are, first, are the leases held by the defendants upon the lands involved in the action invalid by reason of fraud alleged in the awarding the leases to the Eagle-Picher Company over the protests of the Indian owners; and, second, are the leases invalid for want of authority in the Secretary of the Interior to obtain the execution of the leases by the Superintendent of the Quapaw Agency for and on behalf of the Indian owners?

As to the alleged fraud, from a consideration of the evidence and arguments, I am of the opinion that the charge of fraud is not established by complainants. At the trial of the cause, a vast amount of documentary evidence was introduced, as well as the testimony of numerous witnesses. Two of the complainants in the action, Flora Whitebird and Antoine Greenback, stated to the court during the course of the trial, that they did not want the case prosecuted; other complainants stated that they desired that the case go on. There is no evidence of fraud upon the part of the Secretary of the Interior; nor is there evidence of any fraudulent conduct by the Eagle-Picher Lead Company. The evidence concerning the awarding of the leases establishes fairness and a desire upon the part of the Secretary of the Interior to protect the properties and rights of the Indian owners. The fact that an award was made for a 10 per cent. royal-

ty, when bids had been submitted for higher royalties, is insufficient to establish fraud, especially in view of the report of the engineer from the Bureau of Mines and the committee that investigated and analysed the situation. From an observation of the complainants, incompetent Quapaw Indians, as they appeared and testified in court, it is obvious that they are subject to the influence of the white man, and by reason thereof, may easily be imposed upon. Their condition of dependence and inferiority is the justification for the Congressional Act of March 3, 1921. 41 Stat. 1225. By the terms of the act, the complainants, as well as other Quapaw Indians, were declared incompetent to manage and control the lands allotted to them, and the period of restriction was extended upon the alienation of their lands for 25 years. The evidence introduced established that the Eagle-Picher Company, and its sublessees, being lessees in possession, have made valuable improvements for the proper operation of the mines located upon the lands involved herein, and have expended large sums of money in the development of the properties, and that by reason thereof, were shown a preference in the awarding of the leases, but such a preference in view of the circumstances, does not constitute fraud. On the contrary, the evidence is convincing that the leases were fair in terms, and have been very profitable to the lessors, as well as to the lessees. In my opinion, complainants have failed to establish an abuse of discretion on the part of the Secretary of the Interior in the award to the Eagle-Picher Company, for the conduct of the persons competing with the Eagle-Picher Company in submitting bids for higher or larger royalties, the report of the committee, and the engineer from the Bureau of Mines, were considerations of much significance. I am convinced that the charge of fraud has not been sustained.

The other question for determination is whether the leases are valid, having been executed at the direction of the Secretary of the Interior, by the Superintendent of the Quapaw Indian Agency, for the Indian owners upon their refusal to execute after the leases had been awarded to the Eagle-Picher Lead Company. If the leases are to be sustained, there must be statutory authority for the execution of them in the manner in which they have been executed. In other words, Congress, in the exercise of its guardianship and control over restricted Indians, must have, by appropriate legislation, provided for the execution of leases by the Department of the Interior for incompetent Indians, and there must be compliance with the congressional acts, as a prerequisite to the validity of them. A consideration of Acts of Congress touching upon and governing the Quapaw Indians is of much interest and enlightenment, although Act March 3, 1921, § 26 (41 Stat. 1225–1248), is perhaps controlling of the question presented herein.

Under the Treaty of May 13, 1833 (7 Stat. 424), made between the United States and the Quapaw Indians, the United States agreed to convey to the Quapaw Indians 150 sections of land. Pursuant to this treaty the United States conveyed to the Quapaw Indians the lands provided for in the treaty. By the Act of Congress of February 8, 1887 (24 Stat. 388 [25 USCA § 331]), Congress provided for the allotment of the lands in severalty, and by Act of March 2, 1895 (28 Stat. 907), the Secretary of the Interior was authorized to issue patents to the allottees. On September 26, 1896, allotment deeds were issued to the respective allottees in this action covering the lands in question. By Act of June 7, 1897 (30 Stat. 62, 72), the allottees within the limits of the Quapaw Agency, Indian Territory, were authorized "to lease their lands * * * for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes." The same act provided that when it should appear "to the Secretary of the Interior that, by reason of age or disability, any such allottee cannot improve or manage his allotment properly and with benefit to himself, the same may be leased, in the discretion of the Secretary, upon such terms and conditions as shall be prescribed by him." By virtue of the authority of this last-mentioned act, Mary Whitebird and the heirs of Eudora Whitebird and Joseph Whitebird executed the original lease on the three allotments involved herein to George W. Beck, Jr., for a period of 10 years, and by which leases the defendants entered upon the lands for purposes of mining, continuing to mine them until the controversy arose over the award of new leases.

Act Cong. March 3, 1921, § 26 (41 Stat. 1225–1248), provides:

"That section 1 of the Act of Congress approved March 2, 1895, * * * in so far as the same relates to the allotments of land to the Quapaw Indians and to restrictions against alienation of said allotments, be, and the same is hereby, amended so as to provide that the restrictions which now exist against the alienation of the lands allotted to and allotted lands inherited by

the Quapaw Indians named in the letter of January 15, 1921, of the Secretary of the Interior, to wit [inter alia, the allottees under whom the defendants claim] and including any Quapaw allotted or inherited lands in which any of the said named Indians have any undivided interests, be, and the same are hereby, extended for the further and additional period of 25 years from the date of this act: Provided, however, That the Secretary of the Interior may, with or without application of the Indian owner, remove such restrictions, wholly or in part, after he has found such Indian owner to be *as competent* as the average white man to conduct his own business affairs with benefit to himself, under such rules and regulations as he may prescribe in regard thereto, and concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians: *Provided further, That all said lands allotted to or inherited by the Quapaw Indians may, when subject to restrictions against alienation, be leased for mining purposes for such period of time and under such rules, regulations, terms, and conditions only as may be prescribed by the Secretary of the Interior, and said lands while restricted against alienation may be leased for mining purposes only as provided herein."*

It is contended by complainant's counsel that the act set out does not confer authority upon the Secretary of the Interior to initiate leases for incompetent Indians upon lands allotted to them, and that the Secretary of the Interior was without authority to direct the Superintendent of the Quapaw Agency to execute the leases for and on behalf of the Indian owners, and, further, that the Secretary of the Interior was not authorized by the act to promulgate rules and regulations authorizing the Superintendent of the Quapaw Agency to execute leases for restricted or incompetent Indians. To sustain their contention, the following cases have been cited and are relied upon: Ex parte Sharp (D. C.) 13 F.(2d) 651; Morrill v. Jones, 106 U. S. 466, 1 S. Ct. 423, 27 L. Ed. 267; Morrison v. Burnette (C. C. A.) 154 F. 617; United States v. McMurray (C. C.) 181 F. 723. It is insisted by complainants that it is within the power of the Secretary to prescribe the terms and conditions upon which he will approve leases made by restricted Indians, but that he is without power to initiate leases for them, citing La Motte v. United States, 254 U. S. 570, 41 S. Ct. 204, 65 L. Ed. 410; Turner v. Seep (C. C.) 167 F. 646; Midland Oil Co. v. Turner (C. C. A.) 179 F. 74; Jennings v. Wood (C. C.

A.) 192 F. 507; United States v. Brown (D. C.) 15 F.(2d) 565; Hampton v. Ewert (C. C. A.) 22 F.(2d) 81.

Unusual stress has been placed upon the case of Hampton v. Ewert, supra, by counsel for complainants, as being decisive of the instant case. In the Ewert Case, supra, the court had under consideration the validity of a mining lease executed upon the allotment of Mary J. Calf, a deceased Quapaw allottee, by the minor heirs, without the approval of the Secretary of the Interior. The lease had been executed by the guardian of the minors, appointed by the county court of Ottawa county, Oklahoma. The court held that under the Act of June 7, 1897, a minor Quapaw Indian by reason of such minority was incompetent, and that a mining lease of such minor, although approved by the probate court, must have the approval of the Secretary of the Interior to sustain its validity. Judge Van Valkenburgh, in delivering the opinion of the court, said:

"The construction of the department under this and prior acts was consistently to the effect that the term 'age,' used in these acts, embraced minors under the age of 18 years; that the approval of the department was essential to the valid leasing of the allotments of such minors. The administrative practice invoked by appellees, which sought to enlarge the scope of the statute by delegating to the county court the duty of supervision which had been lodged in the Secretary of the Interior, was, as has been said, suggestive merely, was soon abandoned, and can furnish no support to this contention of appellees. Furthermore, the statute in itself is unambiguous in terms. In such case the purpose of Congress cannot be changed by departmental construction. By express enactment Congress had conferred upon county courts the power to approve leases by Indians of the Five Civilized Tribes (Act of May 27, 1908, 35 Stat. 312), and upon this Ottawa county court the same power with respect to Cherokee minors. The absence of such delegation of authority in the case of the Quapaws is conclusively significant."

Particular attention has been directed to the following statement contained in the opinion of the Ewert Case, supra, in support of the contention that the Secretary of the Interior was without power to initiate and procure the execution of the leases involved herein:

"In the first place, the Secretary of the Interior did not approve the old lease. He declared it void. So one of the first elements of subsequent validation is lacking. In the

next place, it appears quite clearly from the record that the regular, customary, and adequate return upon such leases was a sum of money equal to 10 per centum of the market value of the products mined. This lease reserved a royalty of but 5 per cent. It is evident that the Secretary of the Interior did not consider this a fair return, and we concur in that view. The minor Indians were, in our judgment, overreached and imposed upon in the lease conveyance made. The appellants, children and heirs of Mary J. Calf, were all of tender years. Furthermore the power of the Secretary ordinarily is one of approval or disapproval. He cannot initiate or make a lease. Midland Oil Co. et al. v. Turner (C. C. A. 8) 179 F. 74; Seep et al. v. Spade (C. C. A. 8) 179 F. 77; Jennings v. Wood et al. (C. C. A. 8) 192 F. 507."

The rule announced, viz. that the Secretary cannot initiate or make a lease, has become established from constructions of the various acts of Congress pertaining to the Five Civilized Tribes, but it should be limited to the Five Tribes. The authorities cited in the opinion are cases involving acts of Congress referring to the Five Civilized Tribes of Indians, and the acts construed in the cited cases applicable to the Five Tribes specifically provide that the lands may be leased by the allottee subject to the approval of the Secretary. The Act of March 3, 1921, applicable to Quapaw Indians, is broader in its provisions than the acts pertaining to the Five Civilized Tribes, and to that act alone must we look for the Secretary's authority to obtain the execution of the leases herein complained of. In my opinion, the cases establishing the rule of law that the Secretary cannot initiate or make leases, must be confined to those acts of Congress involving the Five Civilized Tribes, because of the language employed in the acts, clearly limiting the power of the Secretary to that of approval or disapproval of leases executed by members of the Five Civilized Tribes. Congress was confronted with a different situation with the Quapaw Indians, whom it declared incompetent, and undertook to assume complete control of the restricted lands of its incompetent wards. That Congress possessed the power to assume complete control of the restricted lands of these incompetent Indians has not been contested.

It is firmly established that Congress has the authority to determine for itself when the guardianship of the United States, which has ever been maintained over the Indians as a dependent people, shall cease. The power of the government to deal with, control, and protect the property of restricted Indians is absolute. It is for Congress to determine when this power must be exercised and how long it shall continue. Tiger v. Western Investment Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738; United States v. Thurston County (C. C. A.) 143 F. 287; Blanset v. Cardin, 256 U. S. 319, 41 S. Ct. 519, 65 L. Ed. 950. The question is one of construction of the Act of March 3, 1921, and it is important to observe the regulations pertinent to the issues involved which the Secretary of the Interior promulgated in accordance with the provisions of the act, as amended by the Act of November 18, 1921 (42 Stat. 221).

These regulations, after defining superintendent, allottee, lessee, lessor, leased lands, and various other terms to be found in departmental leases and the respective duties of the lessees and lessors with reference to such lands, and the manner of awarding leases on bids made, provide in section 9:

"Whenever a lease is awarded to a proposed lessee, as provided in sections 7 and 8 of these regulations, the lease contract shall be executed by the Indian owner of the land, if he is an adult; but in the event of the failure of the Indian to execute such lease contract, the superintendent shall execute said lease contract for and on behalf of said Indian. If the Indian owner of the land is a minor, the lease contract shall be executed by the superintendent for and on behalf of said minor. The leases executed either by the Indian owner of the land or by the superintendent in his behalf shall be subject to the approval of the Secretary of the Interior and shall be effective only upon said approval."

The Secretary of the Interior, in construing the above act, which granted broad powers to the Secretary in the administration of estates of restricted Quapaw Indians, promulgated rules and regulations governing the leasing of such Indians' lands, and included among them, as above set forth, was one vesting him with authority to authorize the Superintendent of the Tribe to execute mining leases for and on behalf of such restricted and incompetent Indians. The Secretary construed the act to confer this authority, and such construction is reasonable and plausible from the language of the act. Courts have uniformly held that, when the executive department of the government is charged with the execution of a statute, places a reasonable construction upon the statute, and acts upon that construction for

a number of years, changes in the construction of the statute are looked upon with disfavor, when parties who have contracted with the government on the faith of the old construction may be injured thereby. United States v. Alabama Great Southern R. R. Co., 142 U. S. 615, 12 S. Ct. 306, 35 L. Ed. 1134; Jacobs v. Prichard, 223 U. S. 200, 32 S. Ct. 289, 56 L. Ed. 405; Hampton v. Ewert, supra.

▊ Aside from the consideration to be given the fact that the Secretary construed the act and proceeded with the leasing of the lands in accordance with that construction, the language of the congressional statute sets forth with clarity the purpose and intention of Congress. The act is special in its nature and character, and is applicable to restricted Quapaw Indians, and those for whose benefit it was enacted, are mentioned in the act as being incompetent. As heretofore stated, the complainants are among those enumerated in the act. It is quite obvious that the above statute came about as a result of the particular condition of the Quapaw Indians, and that condition was fully disclosed by the appearance and conduct of the complainants in the trial of the case. However, with reference to the language employed in the act, we find that the lands "may * * * be leased for mining purposes for such period of time and under such rules, regulations, terms, and conditions only as may be prescribed by the Secretary of the Interior. * * * " It is clear that the lands may be leased only as prescribed by the Secretary of the Interior. The act grants power to the Secretary to prescribe how the lands may be leased, and this may include the terms as well as the physical and mechanical means of leasing and executing the leases. It is sufficiently comprehensive to permit the Secretary to prescribe how the lands may be leased for the Indian owner, as well as the operating lessee. The act does not limit the power of leasing to the Indian owner, subject to rules, regulations, terms, or conditions of the Secretary, but clearly provides that the lands "may be leased" in the manner prescribed by the Secretary.

To construe the act as limiting the execution of the leases to designated incompetent Indians, incapable of caring for their own property rights, and highly susceptible to the influences of those near them, would do violence to the purpose and intention responsible for the enactment of the statute. It should be observed that the same Indian owners who executed leases providing for 7½ per cent. royalty, which leases were rejected by the Secretary of the Interior, refused to execute leases providing for ten per cent. royalty, and the reason therefor undoubtedly is the result of influence brought upon them by superior persons. To construe the act under consideration as to require the execution of the lease by an incompetent Indian owner would have a great tendency to defeat the desired objective, that of exercising a guardianship over the Quapaw Indians declared incompetent, for lands may remain undeveloped and ores unmined because of irresponsible owners, who are under the control of the government. I therefore conclude that the Act of March 3, 1921, confers authority upon the Secretary of the Interior to act as he has in the obtaining of the execution of leases, as prescribed by rules promulgated under congressional authority.

It is my view that the Secretary of the Interior has acted within the scope of authority conferred by the statute. Decree will be entered for the defendants, dismissing complainants' bill.